UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERROL TRAVIS,

       Plaintiff,                                 Hon. Gordon J. Quist

v.                                                Case No. 1:12-CV-96

MARVIN MORGRIDGE, et al.,

       Defendants.
_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Defendant Morgridge's Motion for Summary Judgment. (Dkt. #43). Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Defendant's motion be **denied**.

## BACKGROUND

Plaintiff Errol Martell Travis is presently incarcerated with the Michigan Department of Corrections (MDOC) and housed at the Parnall Correctional Facility (SMT), though the actions about which he complains occurred while he was housed at the Ionia Maximum Correctional Facility (ICF). Plaintiff initiated the present action against the following ICF employees: Corrections Officer Marvin Morgridge; Deputy Warden Nannette Norwood; Inspector (unknown) Goodson; and Grievance Coordinator M. Breedlove. The following allegations are contained in Plaintiff's complaint and the attachments thereto.

Plaintiff alleges that, on July 27, 2011, Defendant Morgridge sexually assaulted him by touching his penis during a shakedown in the prison food service building. When Plaintiff asked Morgridge why he had inappropriately touched him, Morgridge denied doing so. On August 3, 2011, Plaintiff reported the incident to his kitchen work supervisor, Gary Haywood, who informed Plaintiff that there was nothing he could do about the incident. Haywood instead advised Plaintiff to submit a grievance. Later that same day, as Plaintiff was leaving the food service department, Defendant Morgridge again touched Plaintiff's penis during a shakedown. When Plaintiff asked Morgridge why he kept touching his penis, Morgridge instructed Plaintiff to sit down. Morgridge later spoke with Gary Haywood about Plaintiff's allegations. After speaking with Haywood, Morgridge issued a misconduct ticket against Plaintiff for threatening behavior, claiming that Plaintiff had said, "If you touch me again, I'm going to fuck you up."

Following a misconduct hearing held August 8, 2011, Plaintiff was found guilty of threatening behavior and ordered to serve 20 days of detention as the sanction for his misconduct conviction. Plaintiff also was warned that his security classification would be increased. On August 12, 2001, Plaintiff told his appellate attorney about the assault by Morgridge. Counsel sent Plaintiff a letter informing him where and with whom to file his complaint. On September 1, 2011, Plaintiff wrote to the Office of the Legislative Ombudsman, complaining that he had been sexually assaulted. On September 26, 2011, Plaintiff sent Inspector Goodson a copy of the same complaint, but received no response. On September 26, 2011, Plaintiff filed a grievance.

On September 28, 2011, Defendant Breedlove called Plaintiff to the control center to talk about his grievance. Breedlove informed Plaintiff that the subject of the grievance was out of her control and that the deputy warden would have to answer it. That same day, Plaintiff spoke with Defendant

Deputy Warden Norwood, who told Plaintiff to write a statement about what happened to him. Plaintiff wrote a complaint and affidavit of truth. On September 29, 2011, Defendant Goodson called Plaintiff out to speak with him about his complaint. Goodson informed Plaintiff that his complaint and his misconduct hearing packet were being attached to his grievance. She also read to Plaintiff a statement made by Gary Haywood, a copy of which was not provided to Plaintiff. On October 15, 2011, Plaintiff sent kites to Defendants Breedlove and Norwood, inquiring about the status of his complaint but received no response. Plaintiff began experiencing stress and depression because he saw Morgridge each day and knew that nothing was being done concerning his allegations.

On January 16, 2012, Plaintiff called the Michigan State Police to report the assault. On January 18, 2011, Plaintiff spoke with Resident Unit Manager (RUM) Gilkey who informed Plaintiff that the state police had called him about the matter. On January 20, 2012, Plaintiff spoke with Sergeant Cairnduff who informed him that inmates cannot file charges against people who work in the prison. Instead, an inspector or other official has to call the state police to file the charges.

On January 23, 2012, RUM Gilkey informed Plaintiff that Defendant Norwood had no recollection of Plaintiff's complaint or grievance concerning his allegations against Morgridge. Plaintiff told Gilkey that he had a copy of the original grievance, which had been rejected and not pursued to the next steps because the harassment had stopped. Defendant Norwood later increased Plaintiff's security level and transferred him to the Bellamy Creek Correctional Facility, in retaliation for filing the sexual assault complaint against Defendant Morgridge.

Plaintiff alleges that Defendants violated various MDOC policies. Plaintiff further asserts that Defendants violated his rights under the First and Eighth Amendments as well as the Due Process Clause of the Fourteenth Amendment. Plaintiff seeks 1.5 million dollars in damages. Plaintiff also

requests that Defendant Morgridge be criminally prosecuted. On March 16, 2012, the Honorable Gordon J. Quist dismissed Plaintiff's claims against Defendants Norwood, Goodson, and Breedlove for failure to state a claim on which relief may be granted. (Dkt. #13-14).

On August 9, 2012, Defendant Morgridge moved for summary judgment on the ground that Plaintiff has failed to properly exhaust his administrative remedies. (Dkt. #43). The undersigned recommended that Defendant's motion be granted and this matter terminated. (Dkt. #65). Judge Quist, however, rejected this recommendation and instead remanded the matter to this Court "for a report and recommendation on the issue of exhaustion." (Dkt. #72). Judge Quist further held that "the issue of exhaustion is a matter to be determined by the court and not a matter for the jury." Implicit in this determination is that any factual disputes necessary to resolution of Defendant's motion must be resolved by the Court. Accordingly, the undersigned conducted a hearing on the matter at which both sides had the opportunity to present evidence on the exhaustion question.

## **SUMMARY JUDGMENT STANDARD**

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005); *see also*, *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The fact that the evidence may be controlled or possessed by the moving party does not change the non-moving party's burden "to show sufficient evidence from which a jury could reasonably

find in her favor, again, so long as she has had a full opportunity to conduct discovery." *Minadeo*, 398 F.3d at 761 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

Once the moving party demonstrates that "there is an absence of evidence to support the nonmoving party's case," the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini*, 440 F.3d at 357 (citing *Anderson*, 477 U.S. at 247-48; *Celotex Corp. v. Catrett*, 477 U.S. at 324). While the Court must view the evidence in the light most favorable to the non-moving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini*, 440 F.3d at 357. The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006) (citations omitted).

Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and. . .may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353-54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735.

While a moving party without the burden of proof need only show that the opponent cannot sustain his burden at trial, *see Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *Minadeo*, 398 F.3d at 761, a moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). "Where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

## ANALYSIS

A.     Exhaustion Standard

Pursuant to 42 U.S.C. § 1997e(a), a prisoner asserting an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust all available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516, 524 (2002). Prisoners are no longer required to demonstrate exhaustion in their

complaints. *See Jones v. Bock*, 549 U.S. 199, 216 (2007). Instead, failure to exhaust administrative remedies is "an affirmative defense under the PLRA" which the defendant bears the burden of establishing. *Id.* With respect to what constitutes proper exhaustion, the Supreme Court has stated that "the PLRA exhaustion requirement requires proper exhaustion" defined as "compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90-93 (2006). In *Bock*, the Court reiterated that

> Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

*Bock*, 549 U.S. at 218.

When assessing whether a prisoner has properly exhausted his claims as required by the PLRA, it is appropriate to seek guidance from the substantively similar exhaustion rules applicable to petitions for writ of habeas corpus. *See Woodford,* 548 U.S. at 88. In the habeas context, a petitioner is required to properly present his federal claims through one complete round of the State's established appellate review process. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845 (1999). To "'protect the integrity' of the federal exhaustion rule, we ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies." *Id.* at 848 (citation omitted). The Supreme Court has stated that in the habeas context, "the sanction for failing to exhaust properly (preclusion of federal review) is called procedural default." *Woodford,* 548 U.S. at 92. To determine whether a habeas petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar

that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir.2004), *cert. denied,* 544 U.S. 928 (2005); *accord Lancaster v. Adams,* 324 F.3d 423, 436-37 (6th Cir.2003).

Under the procedural default component of § 1997e(a), a prisoner's claims are procedurally defaulted if he fails to complete the administrative review process in accordance with the deadlines and other applicable procedural rules and prison officials actually relied upon the procedural rule to bar review of the grievance. *See Johnson v. Meadows,* 418 F.3d 1152, 1159 (11th Cir.2005), *cert. denied,* 126 S.Ct. 2978 (2006); *Spruill v. Gillis,* 372 F.3d 218, 222 (3rd Cir.2004) (holding that "the determination whether a prisoner has 'properly' exhausted a claim (for procedural default purposes) is made by evaluating the prisoner's compliance with the prison's administrative regulations"). Moreover, just as procedural default in the federal habeas corpus context must be predicated on an adequate and independent state ground, the procedural requirements of a prison grievance system may not be imposed in a way that offends the United States Constitution or the intended purposes of § 1997e(a). *See Spruill,* 372 F.3d at 232.

B. Evidentiary Hearing

The evidence presented at hearing consisted of: (1) exhibits submitted by Defendant; (2) testimony from Grievance Coordinator Myken Breedlove; and (3) testimony from Plaintiff. The parties also made reference to various exhibits previously submitted to the Court.

1. Exhibits

Defendants sought to introduce exhibits demonstrating that Plaintiff has twice been convicted of uttering and publishing and has also been convicted of "false pretenses." Plaintiff did not object to the admission of these exhibits and the Court admitted such for the limited purpose of assessing Plaintiff's credibility.

2. Myken Breedlove

Breedlove provided the following testimony. Breedlove is employed as the grievance coordinator at the Ionia Correctional Facility. In her capacity as grievance coordinator, Breedlove receives and processes the Step I grievances submitted by prisoners. Breedlove testified that prisoners obtain Step I grievance forms from within their individual housing units. After completing a Step I grievance form, the prisoner mails the form to Breedlove who reviews the grievance to determine whether it should be rejected or investigated. Once Breedlove makes this determination, she assigns an individualized identification code to the grievance, enters the relevant information into the grievance database, and then either rejects the grievance or forwards it to the appropriate staff member for investigation. To appeal a grievance to Step II of the process, the prisoner must request a Step II grievance form from Breedlove. Upon receiving a request for a Step II grievance form, Breedlove documents the request in the grievance database and then forwards to the prisoner a Step II grievance form.

Breedlove testified that her records contain no indication that Plaintiff filed a Step I grievance in September 2011. Breedlove testified that if Plaintiff had filed a Step I grievance she would have recorded such in the grievance database. Breedlove later spoke with Plaintiff concerning the

matter, informing Plaintiff that she had not received a Step I grievance from him. Plaintiff subsequently submitted a Step I grievance. This grievance was apparently rejected after which Plaintiff requested a Step II grievance form. Breedlove provided Plaintiff with a Step II grievance form, but Plaintiff never submitted a Step II grievance. Breedlove testified that she has no grudge against Plaintiff and never purposely denies a request by a prisoner for a grievance form. Breedlove also testified that for some period of time, during or close to the relevant time period in this matter, she was absent from work on "stress leave." Breedlove was unable to identify the dates she was on stress leave. Breedlove likewise offered no evidence concerning the existence, or content of, any procedures by which grievances are processed in her absence.

3. Plaintiff Travis

Plaintiff provided the following testimony. Plaintiff submitted a Step I grievance on September 26, 2011, regarding his allegations against Defendant Morgridge. On September 28, 2011, Plaintiff was summoned from his cell to speak with the grievance coordinator. Breedlove acknowledged the grievance that Plaintiff filed, but asserted that the matter was "out of her control" and that the Deputy Warden would have to "handle the situation."

Later that same day, Plaintiff was summoned from his cell to speak with Deputy Warden Nanette Norwood. Deputy Warden Norwood questioned Plaintiff about the grievance he filed against Defendant Morgridge. Norwood then directed Sergeant Kelly to obtain from Plaintiff a written statement concerning his allegations. Plaintiff provided Kelly with an affidavit of truth. (Dkt. #1, Exhibit B3). On September 29, 2011, Plaintiff was summoned from his cell to speak with Inspector Betty Goodson, who informed Plaintiff that the matter would be investigated.

After failing to receive a response to his grievance, Plaintiff, on October 15, 2011, submitted a kite to Breedlove requesting that his grievance be processed and answered. (Dkt. #1, Exhibit B4). Plaintiff received no response to this kite. On October 20, 2011, Plaintiff submitted another kite to Breedlove requesting that she inform him of "the status" of the matter. (Dkt. #1, Exhibit B5). Plaintiff received no response to this inquiry.

Plaintiff has also presented evidence that grievances were not, during the relevant time period, being processed in a timely fashion. Specifically, Plaintiff previously submitted a portion of the minutes from the December 1, 2011 Warden's Forum meeting. (Dkt. #68, Attachment 1). This document indicates that at this particular meeting prisoners reported that their grievances were not being processed properly or in a timely fashion. Deputy Warden Norwood responded that "grievances are being processed and they are getting caught up." The Court recognizes that the prisoners' complaint regarding the processing of grievances does not constitute evidence. The response by Deputy Warden Norwood, however, is relevant and demonstrates that grievances were, during the relevant time period, not being processed in a timely fashion.

Plaintiff also introduced evidence that Breedlove has, on at least one occasion, misidentified his prisoner identification number. Plaintiff's prisoner identification number is 235594. *See* Errol Martell Travis Biographical Information, available at http://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=235594 (last visited on July 10, 2013). In the affidavit that she submitted in support of her request for relief, however, Breedlove misidentifies Plaintiff's prisoner identification number in four separate locations. (Dkt. #83, Exhibit 1). When questioned as to the relevance of this evidence, Plaintiff asserted that the error in question was significant because in the prison system many things, including prisoner grievances, are recorded,

tracked, and managed by reference to a prisoner's identification number. Thus, if in the process of recording a grievance the prisoner's identification number is inaccurately recorded, a subsequent search of the grievance database would incorrectly indicate that the prisoner had not filed the grievance in question. Defendant presented no evidence to the contrary.

C. Analysis

Plaintiff asserts that on September 26, 2011, he filed a Step I grievance concerning his allegations against Defendant Morgridge. Plaintiff asserts that his grievance was not processed (i.e., assigned a grievance number) and, furthermore, that his subsequent inquiries concerning the matter went unanswered. Plaintiff argues that because his attempts to properly grieve the claim in question were thwarted and ignored, he did, in fact, avail himself of all *available* administrative remedies. As previously discussed, Defendant bears the burden to demonstrate that Plaintiff has failed to properly exhaust the claim in question and, as noted above, summary judgment in favor of the party with such burden "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt*, 526 U.S. at 553. As discussed below, Defendant's efforts fall short of the mark.

Myken Breedlove testified that she receives all Step I prisoner grievances and enters them into a database. Breedlove testified that had Plaintiff filed a grievance in September 2011, she would have acknowledged such with entry into the grievance database. Breedlove testified that a search of her database contained no indication that Plaintiff filed a Step I grievance in September 2011.

Plaintiff presented evidence demonstrating that Breedlove has, on at least one occasion, inaccurately recorded his prisoner identification number. Plaintiff testified that grievances are recorded in the grievance database by prisoner number and that if a grievance were entered with an incorrect

prisoner number a subsequent search would incorrectly indicate that the grievance in question had not been filed. Defendant presented no evidence to the contrary. This unrefuted evidence could be interpreted by a reasonable trier of fact as supporting Plaintiff's contention that he filed a grievance but that such was not processed correctly or accurately. The Court notes in this regard that Defendant presented absolutely no evidence that there exist any "checks" or safeguards in the grievance processing system that would either minimize such errors or bring such to the reasonably prompt attention of prison officials.

Defendant's shortcoming is further compounded by Breedlove's testimony that for some period of time, during or close to the relevant time period in this matter, she was absent from work on "stress leave." Breedlove failed to specifically identify the dates she was absent from work. She further failed to present any evidence concerning the existence, or content of, any procedures by which grievances are processed in her absence. From this evidence, a reasonable trier of fact could conclude that Defendant has failed to establish that Breedlove was the individual processing and recording prisoner grievances on the date Plaintiff allegedly submitted the grievance in question, in which case Breedlove's testimony concerning her owns actions and processes fails to advance Defendant's cause. From the complete absence of testimony concerning the processes and procedures employed in Breedlove's absence, a reasonable trier of fact could further conclude that Defendant has failed to establish that grievances submitted in Breedlove's absence were processed or recorded in the manner described by Breedlove.

Defendant attempts to overcome the significant deficiencies in his evidentiary presentation by arguing that even if it is assumed that Plaintiff filed a Step I grievance as alleged, dismissal is nevertheless appropriate because Plaintiff failed to file a Step II or Step III grievance. The

Court is not persuaded. Defendant asserts, and Breedlove testified, that Plaintiff did not file a Step I grievance in September 2011. Plaintiff simply cannot file a Step II or Step III grievance if prison officials fail to acknowledge that he first filed a Step I grievance. This is not a circumstance in Plaintiff's Step I grievance was accepted for filing, but a response never provided. Relevant MDOC policy provides that in such a circumstance the prisoner can (and must) file a Step II and/or Step III grievance notwithstanding the failure by prison officials to timely respond to the grievance in question. *See* Michigan Department of Corrections Policy Directive 03.02.130 (eff. July 9, 2007). Such is inapplicable, however, where the grievance in question was never processed or accepted for filing as Plaintiff alleges.

In sum, for the reasons discussed herein, the undersigned finds that Defendant has failed to satisfy his burden to establish that Plaintiff has failed to properly exhaust the claim in question. Accordingly, the undersigned recommends that Defendant's motion be **denied**.

## **CONCLUSION**

For the reasons articulated herein, the undersigned recommends that <u>Defendant Morgridge's Motion for Summary Judgment</u>, (Dkt. #43), be **denied**.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,


Date: July 17, 2013 /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge