UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERROL TRAVIS,

        Plaintiff,                                Hon. Gordon J. Quist

v.                                                    Case No. 1:12-CV-96

MARVIN MORGRIDGE, et al.,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on an Order from the Honorable Gordon J. Quist directing the undersigned to make "findings of fact and conclusions of law" on the question whether Plaintiff has properly exhausted his administrative remedies. Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Plaintiff has exhausted his available administrative remedies.

## BACKGROUND

Plaintiff Errol Martell Travis is presently incarcerated with the Michigan Department of Corrections (MDOC) and housed at the Parnall Correctional Facility (SMT), though the actions about which he complains occurred while he was housed at the Ionia Maximum Correctional Facility (ICF). Plaintiff initiated the present action against the following ICF employees: Corrections Officer Marvin Morgridge; Deputy Warden Nannette Norwood; Inspector (unknown) Goodson; and Grievance Coordinator M. Breedlove. The following allegations are contained in Plaintiff's complaint and the attachments thereto.

On July 27, 2011, Defendant Morgridge sexually assaulted Plaintiff by touching his penis during a shakedown in the prison food service building. When Plaintiff asked Morgridge why he had inappropriately touched him, Morgridge denied doing so. On August 3, 2011, Plaintiff reported the incident to his kitchen work supervisor, Gary Haywood, who informed Plaintiff that there was nothing he could do about the incident. Haywood instead advised Plaintiff to submit a grievance. Later that same day, as Plaintiff was leaving the food service department, Defendant Morgridge again touched Plaintiff's penis during a shakedown. When Plaintiff asked Morgridge why he kept touching his penis, Morgridge instructed Plaintiff to sit down. Morgridge later spoke with Gary Haywood about Plaintiff's allegations. After speaking with Haywood, Morgridge issued a misconduct ticket against Plaintiff for threatening behavior, claiming that Plaintiff had said, "If you touch me again, I'm going to fuck you up."

Following a misconduct hearing held August 8, 2011, Plaintiff was found guilty of threatening behavior and ordered to serve 20 days of detention. Plaintiff also was informed that his security classification would be increased. On August 12, 2001, Plaintiff told his appellate attorney about the assault by Morgridge. Counsel sent Plaintiff a letter informing him where and with whom to file his complaint. On September 1, 2011, Plaintiff wrote to the Office of the Legislative Ombudsman, complaining that he had been sexually assaulted. On September 26, 2011, Plaintiff sent Inspector Goodson a copy of the same complaint, but received no response. On September 26, 2011, Plaintiff filed a grievance.

On September 28, 2011, Defendant Breedlove called Plaintiff to the control center to talk about his grievance. Breedlove informed Plaintiff that the subject of the grievance was out of her control and that the deputy warden would have to answer it. That same day, Plaintiff spoke with Defendant Deputy Warden Norwood, who told Plaintiff to write a statement about what happened to him. Plaintiff

wrote a complaint and affidavit of truth. On September 29, 2011, Defendant Goodson called Plaintiff out to speak with him about his complaint. Goodson informed Plaintiff that his complaint and his misconduct hearing packet were being attached to his grievance. She also read to Plaintiff a statement made by Gary Haywood, a copy of which was not provided to Plaintiff. On October 15, 2011, Plaintiff sent kites to Defendants Breedlove and Norwood, inquiring about the status of his complaint but received no response. Plaintiff began experiencing stress and depression because he saw Morgridge each day and knew that nothing was being done concerning his allegations.

On January 16, 2012, Plaintiff called the Michigan State Police to report the assault. On January 18, 2012, Plaintiff spoke with Resident Unit Manager (RUM) Gilkey who informed Plaintiff that the state police had called him about the matter. On January 20, 2012, Plaintiff spoke with Sergeant Cairnduff who informed him that inmates cannot file charges against people who work in the prison. Instead, an inspector or other official has to call the state police to file the charges.

On January 23, 2012, RUM Gilkey informed Plaintiff that Defendant Norwood had no recollection of Plaintiff's complaint or grievance concerning his allegations against Morgridge. Plaintiff told Gilkey that he had a copy of the original grievance, which had been rejected and not pursued to the next steps because the harassment had stopped. Defendant Norwood later increased Plaintiff's security level and transferred him to the Bellamy Creek Correctional Facility, in retaliation for filing the sexual assault complaint against Defendant Morgridge.

Plaintiff alleges that Defendants violated various MDOC policies. Plaintiff further asserts that Defendants violated his rights under the First and Eighth Amendments as well as the Due Process Clause of the Fourteenth Amendment. Plaintiff seeks 1.5 million dollars in damages. Plaintiff also requests that Defendant Morgridge be criminally prosecuted. On March 16, 2012, the Honorable Gordon

J. Quist dismissed Plaintiff's claims against Defendants Norwood, Goodson, and Breedlove for failure to state a claim on which relief may be granted. (Dkt. #13-14).

On August 9, 2012, Defendant Morgridge moved for summary judgment on the ground that Plaintiff has failed to properly exhaust his administrative remedies. (Dkt. #43). The undersigned recommended that Defendant's motion be granted and this matter terminated. (Dkt. #65). Judge Quist, however, rejected this recommendation and instead remanded the matter to this Court "for a report and recommendation on the issue of exhaustion." (Dkt. #72). Judge Quist further held that "the issue of exhaustion is a matter to be determined by the court and not a matter for the jury." Accordingly, the undersigned conducted a hearing on the matter at which both sides had the opportunity to present evidence on the exhaustion question. The undersigned thereafter recommended that Defendant's motion be denied on the ground "that Defendant has failed to satisfy his burden to establish that Plaintiff has failed to properly exhaust the claim in question." (Dkt. #99). Judge Quist subsequently adopted this recommendation and denied Defendant's motion for summary judgment. (Dkt. #102). However, noting that there still exists "a genuine issue of material fact as to whether [Plaintiff] was impeded from filing a Step II or Step III grievance," Judge Quist also remanded the exhaustion question to the undersigned "for findings of fact and conclusions of law."

I.  **Findings of Fact**

The Court conducted an evidentiary hearing in this matter on March 20, 2013. In light of the evidence presented, and the Court's assessment of the witnesses' credibility, the undersigned makes the following findings of fact:

1. Plaintiff has twice been convicted of uttering and publishing and has also been convicted of "false pretenses."

2. Myken Breedlove is employed as the grievance coordinator at the Ionia Correctional Facility.

3. In her capacity as grievance coordinator, Breedlove receives and processes the Step I grievances submitted by prisoners.

4. Prisoners obtain Step I grievance forms from within their individual housing units.

5. After completing a Step I grievance form, the prisoner mails the form to Breedlove who reviews the grievance to determine whether it should be rejected or investigated.

6. After making this determination, Breedlove assigns an individualized identification code to the grievance, enters the relevant information into the grievance database, and then either rejects the grievance or forwards it to the appropriate staff member for investigation.

7. To appeal a grievance to Step II of the prisoner grievance process, the prisoner must request a Step II grievance form from Breedlove.

8. Upon receiving a request for a Step II grievance form, Breedlove documents the request in the grievance database and then forwards to the prisoner a Step II grievance form.

9. For an unspecified period of time, during or close to the relevant time period in this matter, Breedlove was absent from work on "stress leave."

10. Breedlove was unable to identify the dates she was on stress leave.

11. Breedlove offered no evidence concerning the existence, or content of, any procedures by which grievances or requests for grievance forms are processed in her absence.

12. Plaintiff submitted a Step I grievance on September 26, 2011, regarding his allegations against Defendant Morgridge.

13. On September 28, 2011, Plaintiff was summoned from his cell to speak with Breedlove.

14. Breedlove acknowledged the grievance that Plaintiff filed, but asserted that the matter was "out of her control" and that the Deputy Warden would have to "handle the situation."

15. Later that same day, Plaintiff was summoned from his cell to speak with Deputy Warden Nanette Norwood.

16. Deputy Warden Norwood questioned Plaintiff about the grievance he filed against Defendant Morgridge.

17. Norwood directed Sergeant Kelly to obtain from Plaintiff a written statement concerning his allegations.

18. Plaintiff provided Kelly with an affidavit of truth.

19. On September 29, 2011, Plaintiff was summoned from his cell to speak with Inspector Betty Goodson, who informed Plaintiff that the matter would be investigated.

20. After failing to receive a response to his grievance, Plaintiff, on October 15, 2011, submitted a kite to Breedlove requesting that his grievance be processed and answered.

21. Plaintiff's grievance was not processed and he received no response to this kite.

22. On October 20, 2011, Plaintiff submitted another kite to Breedlove requesting that she inform him of "the status" of the matter.

23. Plaintiff received no response to this inquiry.

24. During the relevant time period, grievances filed by other prisoners were not being processed in a timely fashion.

25. When confronted about this matter, Deputy Warden Norwood responded that "grievances are being processed and they are getting caught up."

26. Breedlove has, on at least one occasion, misidentified Plaintiff's prisoner identification number.

27. Prisoner grievances are recorded, tracked, and managed by reference to a prisoner's identification number.

28. If, in the process of recording a prisoner's grievance, the prisoner's identification number is inaccurately recorded, a subsequent search of the grievance database will incorrectly indicate that the prisoner had not filed the grievance in question.

## II. Conclusions of Law

### A. Exhaustion Standard

Pursuant to 42 U.S.C. § 1997e(a), a prisoner asserting an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust all available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516, 524 (2002). Prisoners are no longer required to demonstrate exhaustion in their complaints. *See Jones v. Bock*, 549 U.S. 199, 216 (2007). Instead, failure to exhaust administrative remedies is "an affirmative defense under the PLRA" which the defendant bears the burden of establishing. *Id.* With respect to what constitutes proper exhaustion, the Supreme Court has stated that "the PLRA exhaustion requirement requires proper exhaustion" defined as "compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90-93 (2006). In *Bock*, the Court reiterated that

> Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

*Bock*, 549 U.S. at 218.

When assessing whether a prisoner has properly exhausted his claims as required by the PLRA, it is appropriate to seek guidance from the substantively similar exhaustion rules applicable to petitions for writ of habeas corpus. *See Woodford,* 548 U.S. at 88. In the habeas context, a petitioner is required to properly present his federal claims through one complete round of the State's established appellate review process. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845 (1999). To "'protect the integrity' of the federal exhaustion rule, we ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies." *Id.* at 848 (citation omitted).

The Supreme Court has stated that in the habeas context, "the sanction for failing to exhaust properly (preclusion of federal review) is called procedural default." *Woodford,* 548 U.S. at 92. To determine whether a habeas petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir.2004), *cert. denied,* 544 U.S. 928 (2005); *accord Lancaster v. Adams,* 324 F.3d 423, 436-37 (6th Cir.2003).

Under the procedural default component of § 1997e(a), a prisoner's claims are procedurally defaulted if he fails to complete the administrative review process in accordance with the deadlines and other applicable procedural rules and prison officials actually relied upon the procedural rule to bar review of the grievance. *See Johnson v. Meadows,* 418 F.3d 1152, 1159 (11th Cir.2005), *cert. denied,* 126 S.Ct. 2978 (2006); *Spruill v. Gillis,* 372 F.3d 218, 222 (3rd Cir.2004) (holding that "the determination whether a prisoner has 'properly' exhausted a claim (for procedural default purposes) is made by evaluating the prisoner's compliance with the prison's administrative regulations"). Moreover, just as procedural default in the federal habeas corpus context must be predicated on an adequate and independent state ground, the procedural requirements of a prison grievance system may not be imposed in a way that offends the United States Constitution or the intended purposes of § 1997e(a). *See Spruill,* 372 F.3d at 232.

B. Analysis

Plaintiff filed a Step I grievance on September 26, 2011, concerning his allegations against Defendant Morgridge. Plaintiff's grievance was not processed (i.e., assigned a grievance number) and his subsequent inquiries concerning the matter went unanswered. Because Plaintiff's attempts to properly grieve the claim in question were thwarted and ignored, he did, in fact, avail himself of all *available* administrative remedies.

As for Defendant's argument that even if Plaintiff did file a Step I grievance, dismissal of Plaintiff's remaining claims is nevertheless appropriate because Plaintiff failed to file a Step II or Step III grievance. The Court is not persuaded. Plaintiff simply cannot file a Step II or Step III grievance if prison officials fail to acknowledge that he first filed a Step I grievance. This is not a circumstance in which Plaintiff's Step I grievance was accepted for filing, but a response never provided. Relevant MDOC policy provides that in such a circumstance the prisoner can (and must) file a Step II and/or Step III grievance notwithstanding the failure by prison officials to timely respond to the grievance in question. *See* Michigan Department of Corrections Policy Directive 03.02.130 (eff. July 9, 2007). Such is inapplicable, however, where the grievance in question was never processed or accepted for filing as the Court has concluded occurred in this instance.

**CONCLUSION**

For the reasons articulated herein, the undersigned recommends that Plaintiff has exhausted his available administrative remedies.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file

objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

                                                Respectfully submitted,


Date:  October 15, 2013                          /s/ Ellen S. Carmody
                                                ELLEN S. CARMODY
                                                United States Magistrate Judge